**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **REGENTS OF THE UNIVERSITY OF CALIFORNIA**, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **SYLVIA M. BURWELL,** *Secretary, Department of Health and Human Services*, <br><br><br> **Defendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.  13-683 (RDM)

## MEMORANDUM OPINION

Under the Medicare program, the government reimburses health care providers for certain expenses incurred in treating Medicare beneficiaries.  *See* Social Security Act of 1965, Pub. L. No. 89-97, tit. XVIII, 79 Stat. 286, 291 (codified as amended at 42 U.S.C. § 1395 *et seq.*) ("Medicare Act").  The Medicare wage index reflects regional variations in hospital wage costs and is one factor used to determine the amount of a provider's reimbursement.  In 2005, the Department of Health and Human Services adopted a rule that purported to clarify the accounting method used to calculate the wage index.  In this action, numerous hospitals and related entities challenge the application of the 2005 Rule to the wage indices for federal fiscal years ("FFYs") 2007 and 2008.

The matter is presently before the Court on the parties' cross-motions for summary judgment.  Dkts. 21, 23.  The Court held oral argument on the motions on February 16, 2016.  Plaintiffs contend that application of the 2005 Rule to the FFYs 2007 and 2008 wage indices

constitutes impermissible, retroactive rulemaking because the wage index for a given fiscal year

is based on cost data submitted by providers three or four years earlier, and Plaintiffs submitted

their cost data in accordance with the accounting rules then in effect.  Plaintiffs further argue that

the 2005 Rule "is inconsistent with the overall purpose and objective of the wage index statute;"

that the Secretary of Health and Human Services ("Secretary") and her intermediaries have

inconsistently applied the rule without an adequate explanation; and that "the Secretary erred in

applying it to the . . . plaintiffs in this case."  Dkt. 21-1 at 21.  The Secretary responds that the

2005 Rule is a valid exercise of the discretion delegated to her pursuant to the wage-index

provision of the Medicare Act.  Dkt. 23 at 13–21.  She also contends that Plaintiffs waived any

retroactivity claim by failing to raise it in the notice-and-comment process preceding adoption of

the rule, *id.* at 21–22; that, in any event, the rule does not operate retroactively, *id.* at 22–26; and

that, even if it did, the statute authorizes retroactive regulation in these circumstances, *id.* at 26–

28.  Finally, she contends that any alleged inconsistency in the application of the 2005 Rule is

merely a byproduct of the agency's discretion whether to initiate an audit, *id.* at 30–32, and that

Plaintiffs are not entitled to a special exemption from the rule, *id.* at 33–36.  For the following

reasons, the Court **DENIES** Plaintiffs' motion, Dkt. 21, and **GRANTS** the Secretary's motion,

Dkt. 23.

## I.  BACKGROUND

### A.      Statutory and Regulatory Background

Prior to 1983, Medicare providers "were reimbursed for the actual costs that they

incurred, provided they fell within certain cost limits," including the requirement that they be

reasonable.  *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994).  As

a result, when "hospital costs increased, so too did Medicare reimbursements."  *Id.*  In 1983,

however, "Congress . . . completely revised the scheme for reimbursing Medicare hospitals" and adopted the Prospective Payment System ("PPS") in order "to encourage health care providers to improve efficiency and reduce operating costs." *Id.* Under the PPS, qualifying hospitals are reimbursed using fixed, prospective rates for a specified category of treatment. *Id.* In the typical case, the reimbursement rate does not vary from patient to patient or provider to provider. *Id.* *Cf. Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1009 (D.C. Cir. 1999) (explaining supplemental "outlier payments"). "By establishing predetermined reimbursement rates that remain static regardless of the costs [actually] incurred by a hospital [in an individual case], Congress sought 'to reform the financial incentives hospitals face, promoting efficiency in the provision of services by rewarding cost[-]effective hospital practices.'" *Cnty. of L.A.*, 192 F.3d at 1008 (quoting H.R. Rep. No. 98-25, at 132 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 219, 351).

Under the PPS, wages and wage-related costs are a "significant component of the Medicare payment" that qualifying hospitals receive. *Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 2 (D.C. Cir. 2009) ("*Anna Jaques I*"). "Because these costs vary widely across the country, Congress requires the Secretary to adjust Medicare reimbursements according to 'area differences in hospital wage[s].'" *Id.* (quoting 42 U.S.C. § 1395ww(d)(3)(E)(i) (alteration in original)); *see also* 42 U.S.C. § 1395ww(d)(2)(H). The wage index is the mechanism by which the Secretary does so. It is "a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." 42 U.S.C. § 1395ww(d)(3)(E)(i). As the D.C. Circuit has explained:

> The wage index reflects a requirement in the 1983 Amendments that the federal rate be adjusted to reflect geographic variations in labor costs. *See* 42 U.S.C. § 1395ww(d)(2)(H). The area wage indexes for each region are based on wage-cost data periodically submitted by Medicare hospitals across the country. The indexes are used at two points in the prospective payment rate calculation. First, regional wage indexes are used (along with other factors, such as inflation and

hospital case-mix ratios) to modify and standardize the data used to establish the nationwide "federal rate." *See* 42 U.S.C. § 1395ww(d)(2)(C)(ii). Second, once the federal rate has been set, the wage indexes are used to make regional adjustments to the labor-related portion of the federal rate. *See* 42 U.S.C. § 1395ww(d)(2)(H). Because each wage index is used to develop the base national rate as well as to adjust that rate by region, a change in any single wage index can affect the reimbursement rate of each hospital in the country.

*Methodist Hosp.*, 38 F.3d at 1227–28 (internal footnote omitted).

The Medicare Act requires the Secretary to update the wage index "at least every 12 months . . . on the basis of a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States." 42 U.S.C. § 1395ww(d)(3)(E)(i). The statute also requires that the Secretary ensure that the aggregate, adjusted payments do not exceed the aggregate payments "that would have been made in the year without such adjustment." *Id.* "On all other aspects of the wage-index calculation," however, "the statute is silent." *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1163 (D.C. Cir. 2015) ("*Anna Jacques II*").

To calculate the wage index, the Secretary uses data from cost reports that hospitals file annually with fiscal intermediaries, which act as the Secretary's agents in administering the PPS.[1] 42 U.S.C. § 1395h. Historically, the wage index was calculated using data collected in Worksheet S-3, Part II, of providers' cost reports. *See* Dkt. 21-1 at 12; Dkt. 23 at 9; 42 C.F.R. § 413.20(b). "For each fiscal year, the wage index is based on data reported by hospitals 3 or 4 years earlier in annual cost reports." Dkt. 23 at 9; *accord* Dkt. 21-1 at 11; *see also Anna Jaques I*, 583 F.3d at 3. For example, the wage index for FFY 2007 (which began October 1, 2006) was

_____

[1] Fiscal intermediaries are also known as "[M]edicare administrative contractors." *See generally* 42 U.S.C. § 1395h.

4

based on data from hospitals' cost reports for the hospitals' fiscal years that began during FFY

2003.  Dkt. 14-5 at 114.

The present case concerns regulations governing the accounting method used to calculate

the wage index.  In particular, the Plaintiffs challenge the application of a rule adopted in August

2005 to pension costs reported in June 30, 2004 and June 30, 2005 cost reports and used to

calculate the wage indices for FFYs 2007 and 2008, respectively.  The following is an overview

of the evolution of the relevant rules.

On September 1, 1994, the Secretary promulgated a final rule making changes to, *inter*

*alia*, the methodology for calculating the wage index.  *See Medicare Program; Changes to the*

*Hospital Inpatient Prospective Payment Systems and Fiscal Year 1995 Rates*, 59 Fed. Reg.

45,330 (Sept. 1, 1994) ("1994 Rule").  As relevant here, the Preamble to the 1994 Rule stated

that hospitals should "follow Generally Accepted Accounting Principles (GAAP) in developing

the wage-related costs contained in the Worksheet S-3, Part II, for purposes of the hospital wage

index."  *Id.* at 45,357.  The Secretary explained:

> We believe it is appropriate to apply GAAP for these purposes because the
> function of the wage index is to measure *relative* hospital labor costs across areas.
> This function is distinct from that of cost reimbursement, in which applicable
> Medicare principles (which may differ from GAAP) measure the actual costs
> incurred by individual hospitals.  We believe the application of GAAP
> for purposes of compiling data on wage-related costs used to construct the wage
> index will more accurately reflect relative labor costs, because certain wage-
> related costs (such as pension costs) as recorded under GAAP tend to be more
> static from year to year.  Application of Medicare principles, on the other hand,
> could create large swings in these costs from year to year, particularly in years
> when there are large over- or under-funded pension estimates; such application
> might lead to a wage index that does not accurately reflect relative labor
> costs.

*Id.* (emphasis in original).  The regulation was made "effective for cost reporting periods

beginning on or after October 1, 1994. . . .  The changes [did] not affect the [F]FY 1995 wage

index." *Id.* at 45,354; *see also id.* at 45,357.  In support of her decision not to include past cost

reporting periods, the Secretary explained that "it has always been [the Department's] policy not

to apply policy changes retroactively," "it would not be fair to hospitals to require that they

retroactively revise their recordkeeping systems to accommodate these changes," and, although

the adjustments to the wage index would not take effect until FFY 1999, that delay would give

hospitals time "to adjust their fiscal plan[s]." *Id.* at 45,359.

On June 27, 1995, the Secretary promulgated a final rule "to clarify the concept of

'accrual basis of accounting.'" *Medicare Program; Clarification of Medicare's Accrual Basis of

Accounting Policy*, 60 Fed. Reg. 33,126, 33,126 (June 27, 1995) ("1995 Rule").  In so doing, she

observed that "some providers . . . believe that, for Medicare purposes, they [can] . . . rely solely

upon the generic definition of the accrual basis of accounting, whereby . . . expenses are reported

in the period in which they are incurred, regardless of when they are paid." *Id.*  If that

interpretation were credited, Medicare "would be forced to pay currently for accrued liabilities

that either may not be liquidated timely or may never be liquidated." *Id.*  As the Secretary

further explained, although "Medicare recognizes only costs associated with a liability that is

timely liquidated through an actual expenditure of funds[,] GAAP does not offer this assurance

for Medicare." *Id.* at 33,131.  In short, "Medicare payment policy and GAAP have different

objectives.  Medicare's objective for cost payment . . . is to pay providers . . . the reasonable and

proper cost of furnishing services . . . in a specific fiscal period. . . .  [T]he primary goal of

GAAP is the full and proper presentation of accounting data through statements and reports." *Id.*

at 33,127.

The 1995 Rule, codified at 42 C.F.R. § 413.100, accordingly adopted an express

requirement that "[f]or accrued costs to be recognized for Medicare payment in the year of the

accrual," the liability must be liquidated within a specified timeframe.  60 Fed. Reg. at 33,136.

That rule, however, applied only to reimbursements made under traditional Medicare reasonable-

cost principles, and not to in-patient hospitals subject to the PPS.  *See* Dkt. 7-1 at 15 (PRRB

decision in this case concluding that "when § 413.100 was promulgated in the June 1995 Final

Rule, CMS did *not* intend for it to encompass the reporting of wage-related costs for purposes of

the wage index" (emphasis in original)); 60 Fed. Reg. at 33,126 ("This policy pertains to all

services furnished by providers other than inpatient hospital services . . . and certain inpatient

routine services furnished by skilled nursing facilities choosing to be paid on a prospective

payment basis . . . .").  The 1995 Rule was intended to "codif[y] in the regulations Medicare's

longstanding policy regarding the timing of payment for accrued costs by requiring timely

liquidation of liabilities in order to receive Medicare payment."  60 Fed. Reg. at 33,129.  That

policy was designed "to prevent the outlay of Federal trust funds before they are needed to pay

the costs of providers' actual expenditures."  *Id.*

In June 2003, the Secretary attempted to clarify the 1995 Rule's application to PPS

providers by including a note in the Medicare Provider Reimbursement Manual stating that

"[a]lthough hospitals should use GAAP in developing wage related costs, the amount reported

for wage index purposes must meet the reasonable costs provisions of Medicare."  Dkt. 14-5 at

38; *see also Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems

and Fiscal Year 2006 Rates*, 70 Fed. Reg. 47,278, 47369 (Aug. 12, 2005).  As the Secretary later

explained, "[t]he clarification was to ensure that a hospital includes in the wage index only those

pension and other deferred compensation plan costs that meet the timely liquidation requirements

for Medicare reasonable cost principles."  70 Fed. Reg. at 47,369.

In May 2005, the Office of Inspector General of the Department of Health and Human Services ("OIG") "alerted [the Centers for Medicare & Medicaid Services ("CMS")] to . . . preliminary findings regarding hospitals' inconsistent reporting of pension and other postretirement benefit costs as wage data in their cost reports." Dkt. 14-5 at 115. The OIG explained that "[w]hile some hospitals included millions of dollars in unfunded pension and other postretirement benefit costs in their annual wage data, others included only funded amounts." *Id.* In its final report, issued in February 2007, the OIG found that hospitals "overstated their wage data by a total of $326.4 million by reporting unliquidated and/or other postretirement benefit costs," *id.* at 118, and recommended, among other things, that CMS ensure "that its [F]FY 2007 wage indexes were adjusted, and its [F]FY 2008 wage indexes will be adjusted, as appropriate, to account for the inaccurate wage data identified." *Id.* at 111, 122.

On August 12, 2005, the Secretary promulgated a final rule making a variety of revisions to the wage index. *Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates*, 70 Fed. Reg. at 47,278 (Aug. 12, 2005) ("2005 Rule"). As relevant here, the Secretary "clarifi[ed]" that pension and other deferred compensation plan costs used to calculate the wage index must comply with the timely liquidation of liability rule, 42 C.F.R. § 413.100. *Id.* at 47,369. The Secretary explained:

> Since publication of the September 1, 1994 rule, we have periodically received inquiries for more specific guidance on developing wage-related costs for the wage index. . . . Due to recent questions and concerns we received regarding inconsistent reporting and overreporting of pension and other deferred compensation plan costs, as a result of an ongoing Office of Inspector General review, we are clarifying in this final rule that hospitals must comply with the requirements in 42 CFR 413.100, the [Provider Reimbursement Manual], Part I, sections 2140, 2141, and 2142, and related Medicare program instructions for developing pension and other deferred compensation plan costs as wage-related costs for the wage index. The Medicare instructions for pension costs and other deferred compensation costs combine GAAPs, Medicare payment principles, and Department of Labor and Internal Revenue Service requirements. We believe that

> the Medicare instructions allow for both consistent reporting among hospitals and for the development of reasonable deferred compensation plan costs for purposes of the wage index.

*Id.* She further directed that, starting "[w]ith the [F]FY 2007 wage index, hospitals and fiscal intermediaries must ensure that pension, post-retirement health benefits, and other deferred compensation plan costs for the wage index are developed according to the above terms." *Id.* Although by 2005 hospitals had already reported the data used to calculate the wage index for FFYs 2007 and 2008, the Secretary concluded that this was not a problem because, "since cost reporting periods beginning during [F]FY 1995," hospitals had been required "to complete Form 339, a reconciliation worksheet between GAAP and Medicare principles." *Id.* at 47,370. When combined with wage costs included on Worksheet S-3, that reconciliation form provided a basis to determine which pension costs were timely liquidated in compliance with 42 C.F.R. § 413.100, without requiring further reporting.

## B.    Factual and Procedural History

This action is brought under the Administrative Procedure Act, *see* 5 U.S.C. § 706, and the Medicare Act, *see* 42 U.S.C. § 1395oo, and arises from the consolidation of numerous administrative appeals concerning the accounting rule applicable to the computation of the wage indices for FFYs 2007 and 2008.  Compl. ¶ 60.  Plaintiffs consist of 107 hospitals that participated in Medicare in those years, as well as 13 entities that owned and/or operated participating hospitals at the relevant times.  *Id.* ¶ 9.

It is undisputed that the Plaintiffs experienced declines in their FFYs 2007 and 2008 wage indices because of downward adjustments made by fiscal intermediaries to pension costs reported by the University of California ("UC") and/or Catholic Healthcare West ("CHW"). Dkt. 21-1 at 15.  As relevant here, the wage index for FFY 2007 used data on UC and CHW's

pension costs from the providers' 2004 fiscal year-end cost reports ("FY 2004"), and the index

for FFY 2008 included data on UC's pension costs from its 2005 fiscal year-end cost report ("FY

2005").[2] *Id.* at 15–17.  During the relevant time period, UC's defined-benefit pension plan

contained sufficient assets to fund its future obligations, and so it ceased making contributions to

the plan, while CHW made "substantial contributions" to its defined-benefit plan in order to

cover its obligations.  *Id.*  Both UC and CHW used GAAP standards to report pension costs

when they submitted their cost reports in FYs 2004 and 2005; neither limited its reported pension

costs to liabilities that would be liquidated within one year pursuant to 42 C.F.R. § 413.100.  *Id.*

Plaintiffs acknowledge that under GAAP, there are differing—indeed, conflicting—rules

pertaining to the reporting of pension costs depending on the set of standards applied.[3]  *Id.*

UC's hospitals were among the 21 hospitals selected by the OIG for review.  Dkt. 14-5 at

126.  On January 26, 2006, based on the OIG's preliminary findings, UC's fiscal intermediary

proposed audit adjustments for the "Wage Index Audit" that omitted certain previously reported

pension costs from the FFY 2007 wage-index calculation.  Dkt. 14-3 at 366–69.  UC's fiscal

intermediary similarly limited the UC pension costs incorporated into the FFY 2008 wage index

---

[2]  Unlike the federal fiscal year, which runs from October of the previous calendar year to September 30 of the year with which it is numbered, the providers' fiscal years run from July 1 of the prior year to June 30 of the numbered year.  *See* Dkt. 21-1 at 15, 17.  The Court uses "FY" to indicate the provider's fiscal year and "FFY" to indicate the federal government's fiscal year.

[3]  For example, the GAAP rules established for non-governmental entities by the Financial Accounting Standards Board ("FASB"), which UC applied to determine its pension costs, Dkt. 21-1 at 16, differ from the standards issued by the Government Accounting Standards Board ("GASB") with respect to the reporting of pension and postretirement benefits.  *Id.*  "For instance, [Government Accounting Standard] 27 requires that pension expense should equal the required contributions.  If the plan is overfunded, there are no required contributions or recorded pension expense."  Dkt. 14-2 at 69 n.9 (Providers' Final Position Paper before the Provider Reimbursement Review Board).  By contrast, Financial Accounting Standard 87 "requires employers to report an amount on their financial statements regardless of whether they are making current contributions to their pension plan."  *Id.* at 68.

to the amounts actually funded and liquidated within a year.  Dkt. 7-1 at 7.  Finally, CHW's

fiscal intermediary conducted a "wage survey audit" to determine the FFY 2007 wage index and

then limited the amounts considered to those actually funded and liquidated within a year.  Dkt.

21-1 at 17; *see also* Dkt. 7-1 at 7.

UC, CHW, and the non-UC and CHW hospitals involved in this case appealed the

intermediaries' calculations of the pension costs incorporated into the FFYs 2007 and 2008 wage

indices to the Provider Reimbursement and Review Board ("PRRB"), and the PRRB

consolidated the appeals.  Dkt. 7-1 at 6–7.  The PRRB issued its decision on March 12, 2013.  *Id.*

at 3-17.  As relevant here, the PRRB concluded that under 42 C.F.R. § 405.1867, the regulation

defining its legal authority, it was "bound to apply 42 C.F.R. § 413.100 as amended by the

August 2005 Final Rule," and that it accordingly lacked authority to consider Plaintiffs'

retroactivity argument.[4]  *Id.* at 16.  It further ruled that Plaintiffs' "arguments that the 2005

Federal Register pension cost policy is arbitrary and capricious and/or inconsistently applied are

moot because of its previous finding as being bound by § 413.100 as amended."  *Id.* at 16 n.56.

On May 2, 2013, the CMS Administrator declined to review the PRRB decision.  Dkt. 14-1 at

22.  Plaintiffs filed the present action on May 10, 2013, within the 60-day period for seeking

judicial review of the decision pursuant to 42 U.S.C. § 1395oo(f)(1).  The matter is now before

this Court on cross-motions for summary judgment.  Dkts. 21, 23.  Because the PRRB ruled that

it was without authority to decide Plaintiffs' claims pursuant to 42 C.F.R. § 405.1867, the subject

of this Court's review is the actions of the fiscal intermediaries in calculating the FFYs 2007 and

2008 wage indices.  *See* 42 U.S.C. § 1395oo(f)(1) ("Providers shall also have the right to obtain

---

[4]  The PRRB reversed with respect to a separate challenge to the calculation of CHW's FFY
2008 pension costs, a matter not at issue in this case.  Dkt. 7-1 at 17.

judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the [PRRB] determines . . . that it is without authority to decide the question.").

## II.  ANALYSIS

Although "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review[,] . . . the typical . . . standards set forth in Federal Rule of Civil Procedure 56 are not applicable."  *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 77 (D.D.C. 2013) (internal quotation marks and citations omitted).  Rather, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Styrene*, 944 F. Supp. 2d at 77 (internal quotation marks omitted).

Plaintiffs contend that the application of the 2005 Rule to the FFYs 2007 and 2008 wage indices violates the APA and the Medicare Act in multiple respects:  They argue that the relevant cost data was generated before the 2005 Rule was adopted, and that application of the rule to that data constitutes impermissible retroactive rulemaking; that the rule is, in any event, inconsistent with the purposes of the wage-index provision of the Medicare Act; that the new rule has not been applied in a consistent manner; and that there is no sensible reason to apply the rule to fully funded pension plans, like the UC plan.  The Court will address each of these contentions in turn.

## A.      **Retroactivity**

Plaintiffs first contend that application of the 2005 Rule to the wage indices for FFYs 2007 and 2008 constitutes impermissible, retroactive rulemaking.  Dkt. 21-1 at 21.  As an initial matter, the Secretary responds that Plaintiffs waived any retroactivity challenge to the rule by failing to raise that objection during the notice-and-comment period.  Dkt. 23 at 21.  "It is well established that issues not raised in comments before the agency are waived . . . ."  *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002), and Plaintiffs do not dispute that neither they nor any other party raised the retroactivity issue during the notice-and-comment period, *see* Dkt. 24 at 8–13; *see also* Dkt. 23 at 22; *Burnett v. Sharma*, 511 F. Supp. 2d 136, 145–46 (D.D.C. 2007) (holding that plaintiff conceded argument raised in dispositive motion by failing to address it). Plaintiffs contend, however, that the Court should nevertheless reach their retroactivity challenge to the 2005 Rule because review of a rule "is available to a party when [it] is 'brought before this court for review of further [agency] action applying it.'"  *Murphy Exploration v. U.S. Dep't of Interior*, 270 F.3d 957, 958 (D.C. Cir. 2001); Dkt. 24 at 9.  Plaintiffs further assert that the Court should reach the merits of the retroactivity issue because (1) until the 2005 Rule was used to adjust the data for the FFYs 2007 and 2008 wage indices, they lacked reasonable notice that it would apply retroactively, Dkt. 24 at 8–12; (2) even if they did waive the retroactivity challenge, the Secretary in turn waived the right to assert a waiver defense by failing to do so during the administrative appeals, *id.* at 10; and (3) notwithstanding any waiver, the Court should exercise its discretion to reach the retroactivity question because it is purely an issue of law, *id.* at 12–13.

The Court need not resolve the parties' dispute over waiver—and waiver of a waiver— because, "as a general matter," failure to present an issue during the notice-and-comment process is not a jurisdictional bar to judicial review.  *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005).  And, although "courts should not topple over administrative decisions unless the administrative body . . . has erred against

13

objection made at the time appropriate under its practice," *id.* at 1150 (quotation marks and citation omitted) (alteration in original), the Court concludes that the 2005 Rule does not, in any event, constitute impermissible, retroactive rulemaking.

"The general legal principles governing retroactivity are relatively easy to state, although not as easy to apply." *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 859 (D.C. Cir. 2002). In general, "a statutory grant of rulemaking authority will not . . . be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010). This principle is a product of both "general principles of administrative law" and the text of the APA itself, which defines a "'rule'" as "'the whole or a part of an agency statement of general or particular applicability *and future effect* designed to implement, interpret, or prescribe law or policy . . . .'" *Bowen*, 488 U.S. at 216 (Scalia, J., concurring) (quoting 5 U.S.C. § 551(4)).[5] That is, "a rule is a statement that has legal consequences only for the future." *Id.*

"To determine whether a rule is impermissibly retroactive," the Court, accordingly, "first look[s] to see whether it effects a substantive change from the agency's prior regulation or practice." *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 14 (D.C. Cir. 2011) (internal quotation marks and citation omitted). If it does, the Court "then examine[s] its impact, if any, on the legal consequences of prior conduct" to determine whether it operates retroactively. *Id.* "A rule that 'alter[s] the past legal consequences of past action' is retroactive." *Id.* One that "alter[s] only

---

[5] The D.C. Circuit "has treat[ed] Justice Scalia's concurring opinion as substantially authoritative, though noting that [t]he *Bowen* majority . . . neither embraced nor rejected Justice Scalia's view." *Nat'l Petrochem. & Refiners Ass'n v. EPA*, 630 F.3d 145, 162–63 (D.C. Cir. 2010) (alterations in original) (internal quotation marks omitted).

the 'future effect' of past actions, in contrast, is not." *Id.* Where a rule does not "impair[] rights a party possessed when he acted, increase[] a party's liability for past conduct, or impose[] new duties with respect to transactions already completed,'" *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)), it does not attach "past legal consequences" to "past action," *Ne. Hosp. Corp.*, 657 F.3d at 14. Or, as the D.C. Circuit put it in *National Mining Ass'n v. Department of Labor*, "[i]n the administrative context, a rule is retroactive [only] if it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already passed." 292 F.3d at 859 (internal quotation marks and citation omitted).

Even assuming without deciding that the 2005 Rule "effects a substantive change from the agency's prior" regulation or practice regarding computation of the wage index, *Ne. Hosp. Corp.*, 657 F.3d at 14, it does not operate retroactively. The wage index for a particular fiscal year is used to calculate hospitals' compensation for wage-related costs that will be incurred to provide Medicare services in that fiscal year. Thus, the FFYs 2007 and 2008 wage indices were used to determine the amount of compensation hospitals would receive under the prospective payment system for services provided in those years. The Secretary simply used historical data—including historical pension costs—to calculate the *prospective* payment rate. Although the Secretary's application of the 2005 Rule to evaluate historical pension costs from FYs 2004 and 2005 arguably changed the method used to make this prospective estimation, it did not alter the compensation that providers receive for services already provided. Plaintiffs' argument, moreover, misconceives the nature of the prospective payment system. Under the PPS, the wage index is not used to reimburse providers for labor costs incurred in earlier years. Rather, those historical costs are used to determine a fair rate for prospective compensation. In this respect, the Secretary's reliance on data from FYs

2004 and 2005 is no more retrospective than an agency's use of historic precipitation or loan default rates might be for purposes of developing prospective agricultural subsidies or mortgage regulations, respectively.

In reaching this conclusion, the Court does not doubt that the Secretary's decision to apply the 2005 Rule to historic data may have upset the expectations of some providers. But, a rule is not retroactive "merely because it . . . upsets expectations based on prior law," *DIRECTV, Inc.,* 110 F.3d at 826 (alteration in original) (quoting *Landgraf*, 511 U.S. at 280), or merely because it relies on facts "drawn from a time antecedent to the enactment," *Reynolds v. United States*, 292 U.S. 443, 494 (1934); *see also Adm'rs. of Tulane Educ. Fund v. Shalala*, 987 F.2d 790, 798 (D.C. Cir. 1993) (quoting same). As the Supreme Court explained in *Landgraf v. USI Film Products*,

> Even uncontroversially prospective [rules] may unsettle expectations and impose burdens on past conduct:  a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property; a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his life learning to count cards.

511 U.S. at 269–70 n.24. Here, that is all that occurred. Plaintiffs did not have any vested right to receive reimbursement for costs incurred in FYs 2004 and 2005 under GAAP rules. The 2005 Rule did not change the rules previously applied to determine the amount that the hospitals were due for past years. Rather, all the Secretary did was decide that future payments for future services would be based on a complex calculation that considered, among many other variables, the providers' historical pension costs that that were actually and timely liquidated, and not merely accrued for accounting purposes.

Because the Secretary's action affects reimbursement rates only prospectively, Plaintiffs' reliance on *Northeast Hospital Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011), is misplaced. *See* Dkt. 21-1 at 26–27. In that case, the Secretary changed the method of calculating the "disproportionate

share adjustment" ("DSH"), under which the Secretary pays more to PPS hospitals that serve a disproportionate number of low-income patients. *Ne Hosp. Corp.*, 657 F.3d at 3. As the D.C. Circuit explained, this constituted impermissible, retroactive rulemaking because the Secretary applied the new, 2004 interpretation regarding which data to include in the DSH adjustment calculation to the adjustment for FFYs 1999–2002, thereby "chang[ing] the legal consequences of treating low-income patients" during that past period of time. *Id.* at 17. That is, as Plaintiffs acknowledged at oral argument, the agency in *Northeast Hospital Corporation* decreased the amount of reimbursement that a hospital was entitled to receive for reimbursement periods that were already closed. In rejecting these retrospective adjustments, the D.C. Circuit merely held that "the Secretary must be held to the interpretation that guided her approach to reimbursement calculations during the fiscal years." *Id.* at 2; *see also id.* at 5, 16–17. Similarly, in *Bowen v. Georgetown University Hospital*, the Supreme Court invalidated a rule adopted in 1984 that modified the method of computing the wage index and applied the change retroactively, requiring recoupment of Medicare "sums previously paid" to hospitals. 488 U.S. at 207. Here, in contrast, the Secretary applied the 2005 Rule only to establish prospective compensation rates for services not yet provided. She did not alter reimbursement rates for services already provided, amend the rules applicable to past reimbursement periods, or seek to recoup amounts previously paid.

Plaintiffs contend that the 2005 Rule nonetheless operates retroactively because it "alter[s] [providers'] methodology for reporting pension costs" and because the Secretary "determined that the Hospital[s] should have reported their pension and benefit costs differently in [prior] years." Dkt. 21-1 at 25. The Secretary, however, made no such determination. She did not conclude that Plaintiffs submitted the wrong cost data in past years or even that they must revise their previous submissions. Instead, her position was simply that the 2005 Rule required her and her fiscal intermediaries to adjust previously submitted data for purposes of computing the FFYs 2007 and 2008 wage indices. *See* Dkt. 25 at 6 ("[T]he August 2005 Final Rule did not impose any new data-

gathering and reporting obligations on Plaintiffs because the hospitals had already supplied . . . the data required to use [Medicare Reasonable Cost Principles]." (quotation marks omitted)).  As explained in the Federal Register notice, that adjustment was to be achieved by using the costs reported on Worksheet S-3, along with the Form 339 reconciliation worksheet—both of which providers were already required to submit—to calculate timely liquidated pension costs.  70 Fed. Reg. at 47,370.  Thus, the Secretary did not "alter the past legality of" reporting pension costs in accordance with GAAP, "impose any liability for having engaged in" such reporting, "or introduce any retrospective duties for past conduct."  *Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148, 166 (D.C. Cir. 2002).  And, she did not engage in retroactive rulemaking by merely auditing or drawing new conclusions from previously submitted, historical cost data in order more accurately to establish future reimbursement rates—even if that data was previously audited or used for the purpose of reimbursing providers for past services.  *See Adm'rs of Tulane Educ. Fund*, 987 F.2d at 797–98.

Plaintiffs, moreover, do not identify any rule or law giving them a vested right to reimbursement for costs that were reported for PPS purposes under the procedures in effect in FYs 2004 and 2005.  To the contrary, the wage-index provision of the Medicare statute requires the wage index to be updated at least annually.  42 U.S.C. § 1395ww(d)(3)(E)(i).  And the 1994 Rule on which Plaintiffs purportedly relied in making their FYs 2004 and 2005 cost reports stated only that providers should follow GAAP "in developing the wage-related costs contained in the Worksheet S-3, Part II, for purposes of the hospital wage index."  59 Fed. Reg. at 45,357.  Neither that rule nor any other rule declared that all costs reported in accordance with those procedures would be used to compute future wage indices.  Plaintiffs, accordingly, offer nothing to support their contention that they had a vested right to a particular method of computing the wage indices for FFYs 2007 and 2008, as opposed to a mere expectation that the agency would not change the relevant law going forward.  Unsettled expectations, however, are not an uncommon occurrence in

the law, *see Landgraf*, 511 U.S. at 269–70 n.24, and do not, standing alone, establish that a rule is

impermissibly retroactive, *see Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006).

The principal thrust of Plaintiffs' argument ultimately comes down to the claim that it was

unfair to apply the 2005 Rule to the Secretary's consideration of wage data submitted for FYs 2004

and 2005 because "providers such as CHW and the UC had no opportunity during FFY 2003 or FFY

2004 to consider whether and to what extent or how its decisions to fund pension and [post-

retirement benefit] liabilities in 2003 or 2004 would affect the FFYs 2007 and 2008 wage indexes."

Dkt. 21-1 at 25.  Plaintiffs' only evidence that, had they known which accounting rules would apply

to compute the wage index for FFYs 2007 and 2008, they would have made different funding

decisions in 2003 or 2004, was a single expert's equivocal statement, unsupported by any evidence,

that "[t]hey might have."  Dkt. 14-1 at 234.  But, even putting that deficiency aside, Plaintiffs'

contention at most raises a claim of "what has been characterized as 'secondary' retroactivity."

*Bowen*, 488 U.S. at 219 (Scalia, J., concurring).  Primary retroactivity occurs when a regulation

"alter[s] the *past* legal consequences of past actions," *id.* (emphasis in original)—for example, when

the agency changed the amount of reimbursement for already-provided Medicare services in

*Northeast Hospital Corp.*, 657 F.3d at 17; *see also Landgraf*, 511 U.S. at 272 (describing *Bowen* as

"a paradigmatic case of retroactivity in which a federal agency sought to recoup . . . funds that had

been paid to hospitals for services rendered earlier").  "Secondary retroactivity," in contrast, occurs

when "[a] rule with exclusively future effect" has incidental effects on past transactions—for

example, when a rule "that for purposes of assessing future income tax liability" treats previously

nontaxable trusts as taxable, "rendering the previously established trusts less desirable in the future."

*Bowen*, 488 U.S. at 219–20 (Scalia, J., concurring).  "Secondary retroactivity . . . occurs if an

agency's rule affects a regulated entity's investment made in reliance on the regulatory status quo

before the rule's promulgation," and it is subject to review only for reasonableness because a

contrary rule "would hamstring . . . any agency whose decision affects the financial expectations of regulated entities." *Mobile Relay Assocs.*, 457 F.3d at 11.

Here, it is possible—although far from proven—that UC and CHW would have made different pension-funding decisions for FYs 2004 and 2005 had they known that future wage indices would not be computed on the basis of GAAP alone.  But Plaintiffs have failed to carry their burden of demonstrating that application of the 2005 Rule to historical pension cost data was "arbitrary" or "capricious" and thus "invalid" under the APA.  *See Bowen*, 488 U.S. at 220 (Scalia, J., concurring). This is particularly so given the statutory command that the Secretary update the wage index "at least every 12 months," 42 U.S.C. § 1395ww(d)(3)(E)(i), and given the practical lag in obtaining the required wage data.  It is far from evident, moreover, that the statutory goals of the Medicare Act would be served by requiring that the Secretary give advance notice simply for the purpose of allowing providers to restructure their finances to maximize their reimbursement rates.

Finally, Plaintiffs point to the fact that the 1994 Rule applied only to future cost-reporting periods and contend that "the Secretary [should not be permitted] to reverse course from prior practice."  Dkt. 21-1 at 28.  An agency, however, "is free to change its mind so long as it supplies a reasoned analysis[,] [and] [e]xplanation of a change in policy is not subject to a heightened standard of review." *Anna Jaques I*, 583 F.3d at 6 (internal quotation marks and citations omitted); *see also DIRECTV, Inc.*, 110 F.3d at 826 ("The [agency] is entitled to consider and revise its views . . . if it gives a reasoned explanation for the revision" (internal quotation marks and citation omitted)).  Here, the Secretary has provided a reasoned basis for the differing implementation periods for the 1994 and 2005 Rules.  In adopting the 1994 Rule, the Secretary explained that "the *data necessary to institute these changes immediately [were] not available*;" that the Department did "not believe it is appropriate to *change the reporting* rules retroactively;" and that "it would not be fair to hospitals to require that they retroactively *revise*

20

*their recordkeeping* systems to accommodate these changes." 59 Fed. Reg. at 45,359 (emphases

added).  In contrast, in adopting the 2005 Rule, she explained that no revision to recordkeeping

systems was necessary:

> [W]e believe that hospitals and intermediaries should be able to ensure that
> pension and other deferred compensation costs are developed according to the
> above terms by the [F]FY 2007 wage index, as hospitals have been required, since
> cost reporting periods beginning during [F]FY 1995, to complete Form 339, a
> reconciliation worksheet between GAAP and Medicare principles.

70 Fed. Reg. at 47,370.

In determining that the 2005 Rule would apply to the computation of the FFY 2007 wage

index, but not to past wage indices or even to the FFY 2006 wage index, the Secretary acted well

within her discretion to balance the competing goals of prompt implementation of the statutorily

required updates to the wage index, on the one hand, and fairness to Medicare providers, on the

other.  The 2005 Rule does not operate retroactively, and the fact that the Secretary previously

awaited the collection of new cost reports to implement a wide swath of changes to the wage

index is not a sufficient basis to invalidate the 2005 Rule's application to wage data collected in

FYs 2004 and 2005.

**B.      Substantive Challenges**

Plaintiffs also advance three substantive APA challenges to the 2005 Rule and the

manner in which it was applied.  They argue that (1) the 2005 Rule is inconsistent with the

objectives of the wage-index provision of the Medicare Act; (2) the new accounting rules were

not applied in a consistent manner to pension costs reported by other providers; and (3) there is

no reasonable basis for applying the new rule to providers with funded pensions.  Under 5 U.S.C.

§ 706, the party challenging an agency's action "has the burden of showing that the agency

action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law.'" *Advocates for Highway & Auto Safety*, 429 F.3d at 1144 (quoting 5 U.S.C. § 706(2)(A)). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court must satisfy itself, however, that the agency has "examine[d] the relevant data and [has] articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted).

   1. *Consistency with Statutory Authority*

   Plaintiffs contend that 2005 Rule is "contrary to statute and . . . otherwise arbitrary and capricious" because it "does not fulfill the statutory mandate of measuring relative labor costs." Dkt. 21-1 at 29. The Court reviews the Secretary's interpretation of the wage-index provision of the Medicare Act under the two-step framework set forth in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The Court must first consider whether "'Congress has directly spoken to the precise question at issue.'" *Anna Jaques I*, 583 F.3d at 5 (quoting *Chevron*, 467 U.S. at 842–43). If so, that "end[s] . . . the matter." *Id.* But if "the statute is 'silent or ambiguous with respect to the specific issue,'" the Court must "uphold the Secretary's interpretation so long as it is 'based on a permissible construction of the statute.'" *Id.*

   The relevant provision of the Medicare statute provides that:

   The Secretary shall adjust the proportion, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to wages and wage-related costs, . . . for area differences in hospital wage levels by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level. Not later than October 1, 1990, and October 1, 1993 (and at least every 12 months thereafter), the Secretary shall update the factor under the preceding sentence on the basis of a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States. Not less often than once every 3 years the Secretary (through such survey or otherwise) shall

measure the earnings and paid hours of employment by occupational category and shall exclude data with respect to the wages and wage-related costs incurred in furnishing skilled nursing facility services. Any adjustments or updates made under this subparagraph for a fiscal year (beginning with fiscal year 1991) shall be made in a manner that assures that the aggregate payments under this subsection in the fiscal year are not greater or less than those that would have been made in the year without such adjustment.

42 U.S.C. § 1395ww(d)(3)(E)(i).

As Plaintiffs concede, the Secretary is vested with broad discretion in implementing the wage index, and the 2005 Rule does not "specifically and directly conflict" with the Medicare Act. Dkt. 24 at 6. The Act requires only that the Secretary update the wage index at least annually "on the basis of a survey" of participating hospitals and that "any adjustment 'shall be made in a manner that assures that the aggregate payments . . . are not greater or less than those that would have been made in the year without the adjustment.'" *Anna Jacques II*, 797 F.3d at 1164 (quoting 42 U.S.C. § 1395ww(d)(3)(E)(i)). "On all other aspects of the wage-index calculation, the statute is silent." *Id.* The statute does not identify the accounting methodology that the Secretary should apply. It says nothing about whether non-liquidated, accrued liabilities should be included. And it does not require, as Plaintiffs suggest, that the wage index prevent "wide variations in wage index determinations from year to year." Dkt. 24 at 8. In short, broad strokes aside, the statute "does not specify how the Secretary should construct the index," but rather, "through its silence[,] delegated [that] decision[ ] to the Secretary." *Methodist Hosp.*, 38 F.3d at 1230 (internal quotation marks omitted). As the D.C. Circuit has aptly put it, this "is the antithesis of a *Chevron* step one statutory directive." *Anna Jacques II*, 797 F.3d at 1164.

The Court, accordingly, turns to *Chevron* step two—that is, whether the Secretary's interpretation of the statute is 'reasonable and consistent with the statutory scheme and legislative history." *Cnty. of L.A.*, 192 F.3d at 1015 (internal quotation marks omitted). At

*Chevron* step two, "the court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11.  Rather, it need only conclude that the agency's interpretation is a reasonable one. Where the agency's construction of the statute "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute," courts "should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."  *Id.* at 845 (citation and internal quotation marks omitted).  The Court's role is thus limited to deciding whether the agency acted arbitrarily or outside the bounds of the discretion implicitly delegated to it by Congress.

In reviewing rules adopted to implement the wage-index provision, the D.C. Circuit has observed that the statute can "reasonably be interpreted to permit a variety of methods for using the survey data to calculate the wage index." *Anna Jaques I*, 583 F.3d at 5.  Even more importantly, it has also recognized "the 'exceptional breadth of Congress's delegation to the Secretary to establish and administer the wage index,'" *Anna Jacques II*, 797 F.3d at 1166 (quoting *Atrium Med. Ctr. v. U.S. Dep't of Health & Human Servs.*, 766 F.3d 560, 573 (6th Cir. 2014), and has "take[n] special note of the tremendous complexity of the Medicare statute," *Methodist Hosp. of Sacramento*, 38 F.3d at 1229.  "That complexity adds to the deference which is due to the Secretary's decision."  *Id.*  Against this backdrop, Plaintiffs' *Chevron* step-two arguments carry little force.  They contend, for example, that the 2005 Rule sacrifices the "consistency in payments" that the agency trumpeted when it adopted the 1994 GAAP policy. Dkt. 21-1 at 29.  But they offer no answer to the Secretary's subsequent conclusion, based on years of additional experience, that the 1994 Rule promoted consistency at the cost of accuracy.

As the Secretary explained in adopting the 2005 Rule, the revised approach was necessary to exclude from the wage index accounting liabilities "that have not been funded and may never be funded," because "including unfunded deferred compensation costs in the wage index can significantly misrepresent an area's average hourly wage" and risks "an inadequate distribution of Medicare payments among hospitals."  70 Fed. Reg. at 47,369.

The crux of Plaintiffs' argument that the 2005 Rule is contrary to the statute's objectives and is "otherwise arbitrary and capricious" is their conviction that "the Secretary was right the first time with the adoption of the 1994 GAAP Policy."  Dkt. 24 at 7.  An agency, however, "is free to change its mind so long as it supplies a reasoned analysis."  *Anna Jacques I*, 583 F.3d at 6 (internal quotation marks and citation omitted).  Here, the Secretary explained that based on the Department's ongoing experience and the OIG's findings, she had uncovered unanticipated consequences of the 1994 Rule—"inconsistent reporting and overreporting of pension and other deferred compensation plan costs."  70 Fed. Reg. at 47,369.  The Secretary acknowledged that the "use of accrual accounting allows . . . the wage index [to] be more static," but she decided—in the exercise of her substantial discretion—that it was necessary to supplement GAAP accrual accounting principles with a timely liquidation of liabilities rule in order to better serve the objectives of "both consistent reporting among hospitals and . . . the development of reasonable deferred compensation plan costs."  *Id.*  And the Secretary's view that costs not liquidated within a relatively short time frame are not properly considered part of the average hourly wage for a given year is unrebutted.

Plaintiffs' request that the Court second-guess these policy judgments is, to once again borrow the phrase from the D.C. Circuit, "the antithesis of Chevron step" two.  *Anna Jacques II*,

797 F.3d at 1163.  The Court, accordingly, rejects Plaintiffs' contention that the Secretary has misconstrued the wage-index provision of the Medicare Act.

2.  *Consistency of Application*

Plaintiffs also argue that it was arbitrary and capricious to enforce the 2005 Rule in accounting for their pension costs because the rule was not consistently applied by fiscal intermediaries to other providers' pension costs for purposes of the FFYs 2007 and 2008 wage indices.  Dkt. 21-1 at 31–32.  They premise this contention almost exclusively on the testimony of Dale Baker, their expert accountant and health-care consultant, before the PRRB.  *Id.*; *see also* Dkt. 14-1 at 249–74 (Baker testimony).  According to Plaintiffs, Baker testified that he had "discussed the 2005 [Rule] with more than 1200 hospitals from various regions of the United States after the policy was announced," and that, "[b]ased on [these] conversations with these hospitals and his general knowledge and experience[,] . . . Baker became aware that . . . some Medicare fiscal intermediaries were applying the 2005 [Rule], while others were applying the 1994 GAAP Policy."  Dkt. 21-1 at 32.  They add that Baker "testified that he would have been aware," based on his work advising hospitals and his "connections with more than 30 hospital associations, . . . of any significant or widespread adjustments based on the 2005 [Rule]," but he "heard of only a handful of adjustments" for the relevant years.  *Id.*  Finally, Plaintiffs argue that Baker "knew of several hospitals where adjustments were made for the first time in 2011," and that, had the 2005 Rule been applied to these hospitals earlier, the same type of adjustments would have been required.  *Id.* at 32–33.

In response to this asserted inconsistency, the Secretary argues that the 2005 Rule treats all providers alike and that all providers were required to report their pension costs pursuant to that uniform rule.  Dkt. 23 at 30–31.  That contention, however, fails on two levels.  First,

26

Plaintiffs' inconsistency argument is not a challenge to the rule itself, but to the application of the rule.  Second, the Secretary elsewhere contends that the 2005 Rule did not impose any new *reporting* requirement on providers.  Rather, as the Secretary has explained, providers were already required to submit the Form 339 reconciliation worksheet, which the Secretary used along with Worksheet S-3 to calculate liquidated pension costs under the new rule.  *See* 70 Fed. Reg. at 47,370.  The Court is also unconvinced by the Secretary's contention that Plaintiffs' argument is, in effect, a challenge to the Secretary's "absolute discretion" regarding whether and when to enforce a civil or criminal prohibition.  Dkt. 23 at 31 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).  That contention is a straw man that fails to take on Plaintiffs' actual argument—that a rule designed to determine future reimbursement rates for hospitals based on relative differences in labor costs cannot rationally apply where the agency does not collect the relevant data in a consistent or coherent manner.  Dkt. 21-1 at 33 ("[I]t would not be possible to have a meaningful or accurate wage index when, during the same fiscal period, some intermediaries were allowing pension and benefit costs, while other intermediaries were disallowing those same types of costs.").

The Secretary's final argument, however, is on firmer ground.  According to the Secretary, Plaintiffs' contention that the 2005 Rule was applied erratically—and thus arbitrarily—is based on mere speculation.  As she explains, Plaintiffs' "evidence of selective enforcement is limited to [Baker's statement] that he 'did not hear of' or become 'aware . . . of any significant or widespread adjustments' caused by enforcement of the" 2005 Rule.  Dkt. 25 at 12 (omission in original).  Moreover, as the Secretary points out, Baker did not identify "any particular Medicare administrative contractor that did not enforce the requirements of the" 2005 Rule and did not provide competent evidence that the rule "was not enforced" against any

particular hospital.  *Id.* at 13 n.6.  As explained below, the Court agrees that Plaintiffs have failed

to carry their burden of demonstrating that the 2005 Rule was applied to FFYs 2007 and 2008 in

an arbitrary or capricious manner.

As the Secretary argues, Plaintiffs' challenge to the application of the 2005 Rule was

premised almost exclusively on the testimony of Dale Baker.  With only minor exceptions,

however, that testimony was based on speculation and inferences.  Plaintiffs contend, for

example, that Baker based his conclusions on "conversations" with "more than 1200 hospitals

from various regions of the United States."  Dkt. 21-1 at 32.  But, as the administrative record

reveals, those 1200 hospitals did not provide Baker with information regarding how the

Secretary accounted for their pension costs; rather, it was Baker who made presentations about

the GAAP policy *to* these hospitals.  *See* Dkt.14-1 at 251.  Plaintiffs simply infer that had the

hospitals or their fiscal intermediaries made adjustments to comply with the 2005 Rule,

representatives of these 1200 hospitals would have provided him with that feedback.  Similarly,

Plaintiffs argue that "Baker . . . would have been aware . . . through his historic work assisting

hundreds of hospitals with their wage data [and] through his industry connections . . . of any

significant or widespread adjustments based on" the 2005 Rule, but that "he heard of only a

handful of adjustments for FFY 2007" and, likewise, for FFY 2008.  Dkt. 21-1 at 32.  But, in

fact, Baker testified that, for FFY 2007 alone, he was aware of the 21 hospitals included in the

OIG review, an unspecified number of CHW hospitals, nine hospitals in another system, and

three other hospitals that were subject to adjustments based on the new rule.  *See* Dkt. 14-1 at

259; Dkt. 14-5 at 115.  That fact that he was unaware of other adjustments, moreover, does not

show that they did not exist—only that no one told Baker about them.  And, more importantly,

Baker's testimony does not attempt to quantify in any way the number of adjustments actually

required by the 2005 Rule, which affected only those hospitals that reported accrued but unliquidated pension costs, or the number and statistical impact of any missed adjustments. Moreover, although Baker testified that on one occasion an intermediary proposed but did not implement an adjustment limiting the pension costs of another hospital, he did not know the intermediary's reason for not making the adjustment and did not identify the hospital. Dkt. 14-1 at 272.

Only slightly more helpfully, Plaintiffs also point to Baker's testimony that he knew of three hospitals that received adjustments pursuant to the 2005 Rule for purposes of computing the FFYs 2011 and 2012 wage indices and that, in his view, these hospitals should have, but did not, receive similar adjustments in prior years. Dkt. 14-1 at 262. The intermediary, however, raised an objection that there was "no foundation in the record" for the examples, *id.* at 262–63, and when this Court inquired about this at oral argument, Plaintiffs' counsel was unaware of whether or how this issue was resolved. Even assuming there was an evidentiary foundation for Baker's statement, however, there is no basis for the Court to conclude that a failure to apply the 2005 Rule to three hospitals rendered the Secretary's calculation of the wage index unreasonable or arbitrary. Plaintiffs offer no evidence of the magnitude of the allegedly omitted adjustments. Nor do they make any effort to show whether the failure to make these adjustments—or, indeed, the purported failure to make adjustments for dozens of hospitals—would have had a material effect on the wage index.

Plaintiffs are correct that the "disparate treatment" of "similarly situated entities" may give rise to a valid APA challenge, *Anna Jaques I*, 583 F.3d at 7 (quoting *Burlington N. & Santa Fe. Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005)), and this is particularly true where the disparate application of a rule risks undermining the rule's very purpose of

making a meaningful comparison among those entities.  But the "party challenging an agency's [action] has the burden of showing that the agency action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Advocates for Highway & Auto Safety*, 429 F.3d at 1144 (quoting 5 U.S.C. § 706(2)(A)).  Here, Plaintiffs contend that the Secretary's application of the 2005 Rule was so inconsistent that the result of the process was necessarily arbitrary and capricious, in violation of the APA.  But they have failed to offer any evidence about how the purportedly inconsistent application of the rule affected the accuracy of the wage index as a measure of relative labor costs.  Such "[u]nsupported allegations of arbitrary treatment are insufficient for [the Court] to render judgment on the merits of such a claim."  *Anna Jaques I*, 583 F.3d at 7.

       Nor do the cases cited by Plaintiffs support their claim that the purportedly inconsistent application of the 2005 Rule violated the APA.  In *County of Los Angeles v. Shalala*, the D.C. Circuit held that the Secretary arbitrarily treated similar cases differently without a reasonable explanation when she found a dataset too incomplete and unreliable to use in calculating Medicare outlier payments, yet found the same dataset suitable for calculating an across-the-board adjustment to Medicare payments.  192 F.3d at 1022–23.  In *Green Country Mobilephone, Inc. v. FCC*, the D.C. Circuit held that the agency, without adequate explanation, disallowed an application that was filed a few minutes late due to a broken copy machine, despite having accepted an application that was filed an entire day late due to bad weather.  765 F.2d 235, 238 (D.C. Cir. 1985).  And in *Kaiser Foundation v. Sebelius*, another judge of this Court rejected the Secretary's contention that the plaintiffs could not correct an erroneous prior cost report that would affect future reimbursement calculations.  828 F. Supp. 2d 193, 203 (D.D.C. 2011).  The Court explained that the Secretary's position was directly contrary to her position in other

litigation and that "[t]he only real difference" between the two cases was that "perpetuation of the mistake in [the other case] would have resulted in a financial loss to the agency, whereas in this case, the agency stands to gain." *Id.* In each of these cases, the plaintiffs identified specific instances in which an agency applied different standards to similarly situated parties without adequate explanation. Here, in contrast, Plaintiffs have offered little more than speculation about how the 2005 Rule was applied and have offered no evidence about whether and how that application affected the accuracy of the wage index. "In the absence of such a showing, [the Court] need not decide whether the Secretary acted arbitrarily . . . ." *Anna Jaques I*, 583 F.3d at 7.

Significantly, this is not a case where the Secretary has adopted conflicting policies that she cannot reconcile. She adopted a uniform rule applicable to all providers. The only question is whether that uniform policy was applied in such a slipshod manner that the resulting wage index did not reasonably reflect actual wage differences between areas of the country. As to that, Plaintiffs have failed to carry their burden.

3. *Application to Funded Pension Plans*

Finally, Plaintiffs contend that, even if the 2005 Rule is valid in other respects, it should not apply to entities like UC and CHW that have pension plans that are not underfunded. Dkt. 21-1 at 34–36. According to Plaintiffs, the 2005 Rule was adopted to ensure that the wage index does not include pension costs "that have not been funded and may never be funded," *id.* at 34 (quoting 70 Fed. Reg. at 47,369), and "there is simply no rational basis for excluding the actuarially determined pension costs" of pension plans like those funded by UC and CHW "for wage reporting purposes," *id.* at 36. The Secretary, however, was "not required to choose the best solution, only a reasonable one." *Petal Gas Storage, LLC v. FERC*, 496 F.3d 695, 703

31

(D.C. Cir. 2007).  The APA does not mandate that regulations be narrowly tailored to their objective, and it was well within the Secretary's discretion to adopt a uniform rule, rather than one that applied different accounting rules based on the funding status of the provider's pension plan.  Indeed, one objective of the 2005 Rule was consistency in reporting.  *See* 70 Fed. Reg. at 47,369.  As Plaintiffs' own challenge to the consistency with which the 2005 Rule was applied seems to accept, *see supra* pp. 26–31, that rationale carries particular force in a context like this, where the data is collected for purposes of comparing costs among regions of the country.  Finally, even if unfunded pensions were the primary focus of the Secretary's rationale, she acted well within her discretion in deciding to apply a uniform timely liquidation of liability rule to all retirement costs in order to further her broader goals of combatting the "overreporting" of costs in the wage index and ensuring that it reflected only "reasonable deferred compensation plan costs."  70 Fed. Reg. at 47,369.  Plaintiffs may have preferred a different approach, "[b]ut the [mere] availability of alternatives does not render the Secretary's choice invalid."  *Knebel v. Hein*, 429 U.S. 288, 294 (1977).[6]

---

[6]   In light of the Court's conclusion on the merits, it need not reach the Secretary's argument that Plaintiffs' claim should be rejected for the additional reason that "neither Plaintiffs, nor any other provider, raised it in comments to the rulemaking."  Dkt. 23 at 34.

### III.  CONCLUSION

For the foregoing reasons, the Court holds that the challenged adjustments to UC and CHW's reported pension costs for purposes of developing the FFYs 2007 and 2008 wage indices did not violate the APA.  The Court, accordingly, **DENIES** Plaintiffs' motion for summary judgment, Dkt. 21, and **GRANTS** Defendant's motion for summary judgment, Dkt. 23.  A separate order accompanies this opinion.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date: February 22, 2016